FILED
8/22/17 4:16 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| MONROE HEIGHTS DEVELOPMENT | : | Case No. 17-10176-TPA |
| CORPORATION, INC., | : | |
| *Debtor* | : | Chapter 11 |
| | : | |
| CITIZENS & NORTHERN BANK, | : | Related to Doc. No. 17, 32 |
| *Movant* | : | |
| | : | |
| v. | : | |
| | : | |
| MONROE HEIGHTS DEVELOPMENT | : | |
| CORPORATION, INC., | : | |
| *Respondent* | : | |

Appearances:       David Ross, Esq., for the Movant
                         Donald Calaiaro, Esq., for the Debtor/Respondent
                         George Snyder, Esq. for Shaner Hotel Holdings Limited Partnership
                         Larry Wahlquist, Esq. for the Office of the U.S. Trustee

## <u>MEMORANDUM OPINION</u>

This voluntary Chapter 11 case was filed on February 22, 2017, by John Habjan ("Habjan"), who is identified in the petition as "Shareholder" of the Debtor.  Shortly thereafter, on March 2, 2017, Citizens and Northern Bank ("the Bank") filed an ***Expedited Motion to Dismiss Chapter 11 Bankruptcy Petition*** ("Motion") at Doc. No. 17.  The basis for the *Motion* is the Bank's argument  that a pre-petition state court order vested the management authority of the Debtor, including the sole authority to file a voluntary bankruptcy petition for the Debtor, in Shaner Holding Company (hereinafter "Shaner" or "the Receiver") as a receiver, thereby rendering a filing by the Debtor's shareholders as unauthorized.  With the agreement of Habjan, Shaner has been operating the Debtor while the *Motion* is pending.

1

After allowing some time for a response to be filed and discovery to be conducted, the Court scheduled an evidentiary hearing on the *Motion* for May 4, 2017.  Following that hearing,  the two sides were given time to file post-hearing briefs.[1]  The *Motion* is now ripe for decision.  For the reasons set forth below, the Court finds that the *Motion* must be granted, but for the reasons stated below its effectiveness is being delayed for 14 days to allow the Debtor to seek reconsideration if it chooses.[2]

### FINDINGS OF FACT

The Debtor is a Pennsylvania business corporation that owns and operates 3 hotels in the Commonwealth, one in Clarion, one in Grove City, and one in Marienville.  The Debtor was incorporated effective November 1, 1991, as a "Business-statutory close" corporation under *15 Pa. C.S. §2303*, with Habjan and his then-wife, Diane S. Habjan ("Diane"), identified as the incorporators.  On December 2, 1991, 500 shares of stock in the Debtor were issued to Habjan and 500 shares to Diane.  They were the only shareholders in the Debtor from 1991 until 2008.

---

[1]    The Parties agreed to forego closing arguments following the hearing and instead just file post-trial briefs setting forth their positions.  The Court agreed to that procedure, while also reserving the right to subsequently schedule an oral argument if following review of the briefs it thought such would be helpful.  Having now reviewed the briefs, the Court does not believe oral argument would be helpful and so will not schedule it.

[2]    The Court has jurisdiction to decide the *Motion* pursuant to *28 U.S.C. §§157* and *1334.*  This is a core matter pursuant to *28 U.S.C. §§157(b)(2)(A).*  This memorandum Opinion represents the Court's findings of fact and conclusions of law under *Fed.R.Bankr.P. 7052.*

In 2008, Habjan and Diane were going through a divorce. They entered into a Marital Settlement Agreement ("MSA") dated September 26, 2008, pursuant to which Diane agreed that all of her shares in the Debtor would be transferred to Habjan. The MSA also indicates that at the time the Debtor was indebted to Northwest Savings Bank, an obligation on which Habjan and Diane were also personal guarantors, Habjan agreed to refinance the obligation so as to release any personal liability of Diane. A divorce decree was issued on October 7, 2008, and it incorporated the terms of the MSA.

Apparently in furtherance of the part of the MSA concerning the Debtor, on a parallel track Habjan sought to arrange new financing for the Debtor through the Bank. On September 25, 2008, the Bank loaned $3,500,000 to the Debtor, personally guaranteed by Habjan, and secured by substantially all of the Debtor's assets, including first priority mortgages on the real property on which the hotels are located.[3] Copies of the various loan documents, including the mortgages, are attached as exhibits to the *Expedited/Emergency Motion for Status Conference* that the Bank filed on February 24, 2017 at Doc. No. 9 and their validity has not been questioned by the Debtor.

No documentary evidence was submitted at the evidentiary hearing to show that Diane's shares in the Debtor were actually transferred to Habjan pursuant to the MSA, but testimony to that effect was given which the Court found to be credible. The Court thus finds that at some point in or about the fall of 2008 Habjan became the sole shareholder in the Debtor. Then, on January 3,

---

[3]     The 3 parcels of real property owned by the Debtor on which the Bank has mortgages are  151 Hotel Drive, Clarion Pa. (identified as Clarion County Parcel No. 19-030-020-000), 2049 Leesburg Grove City Road, Grove City, Pa. (identified as Mercer County Parcel No. 29-217-030-002), and 252 Cherry St., Marienville, Pa. (identified as Forest County Parcel No. 16-06D-149).

2009 two additional share certificates in the Debtor were issued, Share Number 3 to Habjan for 400

shares, and Share Number 4 to Pauline Fleming ("Griebel"),[4] his daughter, for 100 shares.  Since

that date up to the present Habjan and Griebel  have been the only shareholders of the Debtor with

Habjan owning 900 shares (90%) and Griebel owning 100 shares (10%).  In addition to becoming

a shareholder at that time, Griebel  also became the secretary of the Debtor and became involved in

the day-to-day operation of the hotels.

Due to what it alleges were various loan defaults by the Debtor, on August 23, 2016,

the Bank initiated six separate civil actions against the Debtor, consisting of a Complaint in Mortgage

Foreclosure and a Complaint in Confession of Judgment filed in state common pleas court in each

of the 3 counties where the Debtor's hotels are located, *i.e.*, Clarion County, Mercer County, and

Forest County.  The complaints were served on the Debtor, which failed to respond.  On October 7,

2016 the Bank obtained default judgments of approximately $2.8 million against the Debtor in each

of  the foreclosure actions and confession of judgment actions.

On January 30, 2017, the Bank filed a Motion to Appoint Receiver ("Receiver

Motion")  in the Mercer County foreclosure action, Mercer County Case No. 2016-2288.  The

Receiver Motion argued that the Bank was entitled to have a receiver appointed for the Debtor based

on the loan documents, specifically pointing to Section 3.2(f) of the mortgages,[5] which under the

---

[4]        Pauline Fleming's name at some point became Pauline Griebel because that is how
she identified herself at the hearing, *May 9, 2017 Hearing Tr.* at p. 137, and that is the name the
Court uses herein to identify her.

[5]        It appears that the same form document was used for the mortgages on all 3 of the
Debtor's real property parcels.

heading "Defaults and Remedies" provides, in relevant part,  that upon the occurrence of an event

of default the Bank may at any time:

> (f)     Take such other actions or proceedings as the bank deems
> necessary or advisable to protect its interest in the Property
> and ensure payment and performance of the Obligations,
> including without limitation, appointment of a receiver (and
> the Mortgagor hereby waives any right to object to such
> appointment) ....

The Receiver Motion further argued that, in addition to the language in the mortgage, the Bank was

entitled to the appointment of a receiver "based on the equities," citing to *Pa.R.Civ.P. 1533*.

An Affidavit of Service that was filed by the Bank in connection with the Receiver

Motion indicates that the Receiver Motion itself was served on the Debtor on January 30, 2017 via

both  Federal Express and U.S. First Class Mail sent to the Clarion hotel, and then on February 2,

2017, the order issued by the Mercer County court scheduling a hearing on the Receiver Motion for

February 16th was served in the same manner.  In both instances, the Federal Express deliveries were

signed by someone at the Debtor's Clarion hotel office named "K. Bair."  In addition, on February

3, 2017, both the Receiver Motion and the scheduling order were served by U.S.  First Class Mail

on Habjan at post office box addresses in Clay, WV and Clarion, PA that the Bank had  known him

to use.

A hearing on the Receiver Motion was held on February 16, 2017, beginning at 11:15

A.M. before Judge Christopher St. John of the Mercer County Court of Common Pleas.  Habjan

appeared at the hearing, identifying himself as the primary (90%) shareholder of the Debtor.[6]  He

identified Griebel as the owner of the remaining 10% of shares in the Debtor.  Habjan testified that

he had not been aware of the hearing until 4:45 P.M. the previous day when Griebel called and told

him there was a hearing involving "Citizen Northern" the next day that he had to attend.  Habjan

stated that he had just received the "package" with the Receiver Motion that morning, though

acknowledging that it was his understanding that previously it had been "dropped off at one of the

motels."

Judge St. John explained the nature of the receivership proceeding to Habjan and

asked if he had enough information to say whether he agreed that a receiver should be appointed,

and whether he needed to consult with an attorney.  Habjan stated that he would prefer to consult

with an attorney and requested a 30-day continuance for that purpose.  Counsel for the Bank

opposed the request for a continuance, outlining a number of reasons why the Bank believed prompt

action was necessary, such as arrearage in the Debtor's monthly payments, an IRS levy, and a

number of judgments entered against the Debtor (in addition to the judgments that the Bank itself

had obtained).  Judge St. John denied the request for a continuance and the hearing proceeded.

In the state court proceeding the Bank first called Adam Mertes as a witness.  Mr.

Mertes identified himself as a Commercial Resource Recovery Officer employed by the Bank, and

the person who had verified the Receiver Motion on behalf of the Bank.  His testimony was that the

Debtor was $192,109.64 in arrears on the loan from the Bank, that the Debtor had failed to provide

---

[6]      A transcript from the hearing on the Receiver Motion is appended as Exhibit C to the
*Motion.*

the Bank with quarterly financial statements for the years 2016 and 2017 as required by the mortgages, that the Debtor was required to maintain its operating account at the Bank under the mortgage and that such account currently had a zero balance, and that numerous judgments had been entered against the Debtor. Mr. Mertes also testified that he had a meeting with Mr. Habjan in April 2016 to discuss the loan, but that attempts to schedule an additional meeting thereafter were not successful because he had "lost contact" with Habjan. Mr. Mertes testified that the Bank was concerned about the condition of its collateral, and that it thought Shaner would do a good job as receiver.

Habjan was given an opportunity to cross-examine Mertes, but stated that "I'm just at such a loss right now that I don't know what to ask." In response to some questions asked by Judge St. John, Mertes explained the efforts he had made to communicate with Habjan since the April 2016 meeting, saying that he had made phone calls, sent letters, and sent e-mails, but that Habjan had not responded since June 2016. Mertes also testified in answers to questions from the judge that the Mercer hotel had come under increased competitive pressure due to new hotels opening in the vicinity. On redirect examination by the Bank's attorney, Mertes testified that in 2015, following the entry of a default judgment against it by Microtel, the Debtor had lost the Microtel "flag" it had been using at the time the loan was made, and that shortly afterward in early 2016, the Debtor had begun falling behind in loan payments.

The next witness called by the Bank was Plato Ghinos, the president of Shaner. He described the company and its experience in operating hotels and acting as a receiver. He also explained what Shaner planned to do if it was appointed to act as a receiver for the Debtor, and what

its charges would be.  The Bank's attorney also went over the proposed order that had been filed

along with the Receiver Motion.  Ghinos testified that Shaner would be able to comply with its

obligations as set forth in the order.  Habjan was given a chance to cross-examine, but again had no

questions. Judge St. John followed up with some questioning about various aspects of what Shaner

would propose to do if appointed as receiver.

   The Bank rested its case after the testimony by Ghinos and the court told Habjan he

could testify.  Habjan took the stand and was first questioned by the court as to some background

information.  Habjan then gave a narrative as to why he did not think a receiver needed to be

appointed.  He blamed the declining business at the hotels on the decreased activity in the oil/gas

drilling business in the area, on the exchange rate between the U.S and Canada which he said was

discouraging Canadian shoppers from coming to the U.S., and on increased competition.  He stated

that he did not believe anything a receiver could do would change any of those factors.  He

acknowledged that there had been some missed payments on the loan, but said that those had

occurred almost a year earlier, that more recently payment had been made every month, and  that

the missed payments would be made up "this coming summer."   Habjan also testified that the

Debtor's outside accountant had missed an income tax return filing deadline, and that as a result the

Bank had  increased the interest rate on the loan, raising the monthly payment due on the loan by

$5,000.  He also stated that he had an attorney named Troese who he believed would be able to step

into the case and  that the Debtor would be able to prove that a receiver was not needed.

   Judge St. John had some additional questions, including why Habjan had stopped

responding to communications from the Bank.  Habjan responded that he had been upset because

the Bank had raised the interest rate on the loan due to the late tax filing by the accountant.  He

professed to be unclear as to the various lawsuits the Bank had filed, though in the end he

acknowledged a belief that the Bank had obtained judgments against the Debtor.  Habjan also

testified that he was actively involved in operating the hotels, stating that he did everything from

working the front desk to maintenance, and that he shuttled among the three hotels.  Habjan stated

that Griebel  kept the books and did the hiring/firing for the hotels.

> So what I am effectively doing is unfortunately things have gotten so bad
> for these three hotels that I am appointing somebody else to run them. That
> means that the receiver is in charge, not you, and the goal here is to turn this
> entire operation around to make it successful, either to put it in a position
> where the receivership can be terminated and you can begin running it
> again, or putting it in a position where it would be marketable to sell to pay
> off your various creditors.

At the conclusion of the testimony, Judge St. John  stated that he was going to grant

the Receiver Motion.  He explained what he was doing as follows:

*Receiver Motion Tr.* at p. 89, lines 13-21.  In granting the Receiver Motion following the hearing,

Judge St. John simply adopted the very detailed 18-page proposed order that the Bank had submitted

with it, only filling in a few blanks with dates and times before signing it ("Receiver Order").   The

Bank relies on the Receiver Order, and particularly Paragraph 22 thereof, in support of its argument

that the Receiver has stepped into the shoes of the board of directors with the sole power and

authority to file a voluntary bankruptcy petition for the Debtor.  Also of significance is Paragraph

38 of the Receiver Order which enjoins the "directors, managers, partners, officers, agents,

employees or other representatives" of the Debtor from interfering in any way with the Receiver and

denies them the authority to take any action on behalf of the Debtor, including the commencement

of any bankruptcy.

9

Six days after the Receiver Order was entered the bankruptcy petition was filed.  As was indicated above, Habjan signed the petition and purportedly did so in his capacity as the majority shareholder of the Debtor.

## *DISCUSSION*

In the *Motion* the Bank is seeking a dismissal of the case on the grounds that under applicable state law only the Receiver, acting in place of the Debtor's  Board of Directors pursuant to the Receiver Order,  had the authority to make a voluntary bankruptcy filing on behalf of the Debtor.  Thus, according to the Bank, the filing made by Habjan, purportedly on behalf of the Debtor,  was not authorized, and the case must therefore be dismissed.  The Debtor[7] responds with several arguments.  First, it argues that the Receiver Order was void because the state court lacked jurisdiction and violated the due process rights of Habjan and Griebel.  Second, it argues that the Bylaws of the Debtor did give  Habjan the authority file the bankruptcy in his capacity as a shareholder of the Debtor.  Third, the Debtor contends that the Receiver Order should not be enforced because it impermissibly interferes with the Debtor's access to bankruptcy court by attempting to enjoin Habjan from filing for bankruptcy for the Debtor.

Before turning to a discussion of the legal positions of the Parties  the Court must first determine the appropriate allocation of the burden of proof.  While that should be a straightforward

---

[7]    The Court is well aware that the arguments against the *Motion* are actually being made by Habjan, and that his authority as shareholder  to act on behalf of the Debtor is the ultimate issue to be determined in deciding the *Motion*.  By identifying the response as coming from "the Debtor", the Court is not prejudging the issue but merely for the sake of convenience  conforming to the identity of the Respondent as set forth in the caption of the *Motion*.

matter, it is complicated by the fact that the *Motion* merely refers to "lack of authority" as the basis for dismissal of the case, without citing to any specific statutory provision that would authorize the Court to grant such relief on that basis.  The Debtor has not questioned the Court's power to grant the requested relief, but nevertheless the Court, sensitive to the limited nature of its authority, prefers to identify a statutory ground for such power.  One obvious candidate is *11 U.S.C. §105(a)* which gives bankruptcy courts the power to issue any order that is necessary or appropriate to carry out the provisions of the Bankruptcy Code.  However, the Court views that as something to be relied upon only as a "last resort."  *In re Rodgers*, 2011 WL 4101265 *1 (Bankr. W.D. Pa. September 13, 2011).

In this instance, the Court finds that *11 U.S.C. §1112(b)*, which allows bankruptcy courts to dismiss Chapter 11 cases "for cause," provides a statutory basis for the relief requested in the *Motion*.  It is true that lack of authority does not appear in the list of specific circumstances set forth in *Section 1112(b)(4)* that can constitute cause for dismissal, but that list is preceded by the word "includes," and it is therefore not to be construed as limiting.  *See, 11 U.S.C. §102(3)*.  A number of cases have explicitly found that a lack of authority to have filed a bankruptcy petition can constitute cause for dismissal under *Section 1112(b)*.  *See, e.g., In re Comscape Telecommunications, Inc.,* 423 B.R. 816, 829 (Bankr. S.D. Ohio) (citing cases).

The Parties have not pointed to any authority from the Third Circuit specifically addressing the allocation of the burden of proof on a motion to dismiss a case for cause due to lack of authority to file, nor has the Court located any on its own.  Bankruptcy courts elsewhere faced with such motions have generally adopted one of three different approaches to the burden of proof.

11

Some courts have placed the burden of proof of lack of authority solely on the moving party. Others place the burden of proving the existence of authority on the party that filed the bankruptcy. Others still, place the burden of proof initially on the moving party to make out a prima facie case for dismissal, and if that obligation is met, shift the burden to the party that filed the bankruptcy. *See, e.g., In re Quad-C Funding LLC*, 496 B.R. 135, 141-42 (Bankr. S.D.N.Y. 2013) (discussing the different approaches and citing cases for each); *In re Oregon Homes, LLC*, 2014 WL 4794861 *2 (Bankr. N.D. Ohio September 25, 2014).

The Court's initial inclination is that the third approach, with a shifting burden framework, is most appropriate in the circumstances presented here. If the Court were to place the burden solely on the Debtor to show the existence of authority to file the petition, that would allow any aggrieved party to indiscriminately force a debtor to expend its limited resources litigating over the issue of whether it could access the bankruptcy system. *See, In re NNN 123 North Wacker, LLC* 510 B.R. 854, 859 (Bankr. N.D. Ill. 2014). If the Court were to place the burden solely on the Bank to show a lack of authority, it would ignore the fact that doing so would effectively require the Bank to overcome what amounts to affirmative defenses by the Debtor[8] in contravention of the principle that the burden is normally on the proponent of such a defense. The burden-shifting approach is a middle solution that avoids either of those two undesirable outcomes.

Such an approach would also seem to be in accord with the general jurisprudence within the Third Circuit as it relates to burden of proof on motions to dismiss in bankruptcy cases.

---

[8]    As will be discussed below, all of the issues raised by the Debtor amount to either an attack on the Receiver Order in some fashion or an attempt to somehow circumvent it.

For instance, when a motion is filed seeking dismissal of a case as having been filed in bad faith –

like lack of authority another recognized ground of "cause" for dismissal not included in the list at

*11 U.S.C. §1112(b)(4)* – this sort of burden shifting is employed.  *See*, e.g., *In re Paradigm

Elizabeth, LLC*, 2015 WL 435067 *3 (D.N.J. February 2, 2015) ("If a moving party presents

sufficient evidence placing the debtor's good faith at issue, the burden of proving that a chapter 11

petition was filed in good faith is on the petitioner.");  *In re Zais Inv. Grade Ltd. VI*, 455 B.R. 839,

848 (Bankr. D.N.J. 2011) ("When a party files a motion to dismiss and places good faith 'at issue'

by presenting a prima facie case of bad faith in the filing, the non-moving party bears the burden of

demonstrating good faith,"  citing *In re SGL Carbon Corp*. 200 F.3d 154 (3d Cir. 1999)).

Burden shifting is also in a sense incorporated into the structure of *Section 1112(b)*

itself, in that even though a moving party may have demonstrated cause for dismissal, a debtor may

still avoid that result if it can show that "unusual circumstances" exist such that dismissal would not

be in the best interest of creditors and the estate.  *See, 11 U.S.C. §1112(b)(2); In re Domiano*, 442

B.R. 97, 107 (Bankr. M.D. Pa. 2010) ("Section 1112(b) utilizes a burden shifting approach in

Chapter 11 cases where conversion or dismissal has been requested. [The Movant] has shown cause

for conversion or dismissal.  The burden now shifts to the Debtors to show 'unusual circumstances'

that establish such relief is not in the best interests of creditors and the estate."); *In re Korn*, 523

B.R. 453, 464 (Bankr. E.D. Pa. 2014).

The Court thus finds it appropriate to employ a burden-shifting approach here.  As

to the actual  mechanics of that approach, the Court is guided by the recent decision in *In re

Wettach*, 811 F.3d 99 (3d Cir. 2016) wherein the court discussed a "Thayer" or "bursting bubble"

type of presumption in the context of a fraudulent transfer claim.  Under this approach, the Court

starts with a rebuttable presumption that the Debtor's bankruptcy filing was authorized.  If the Bank

is able to produce some evidence sufficient to  make  out a prima facie case that the filing was

unauthorized and the case should be dismissed, the presumption disappears and the burden shifts

to the Debtor to show that the filing was authorized.

### *The Bank's Prima Facie Case*

The Bank has made out a prima facie case for dismissal of this bankruptcy on the

basis of a straightforward argument.  First, *Price v. Gurney* 324 U.S. 100 (1945) stands for the

propositions that: (a) a bankruptcy petition for a corporation may be filed only by those with the

authority to take such action on behalf of the corporation; (b) the law of the state where the

corporation is incorporated determines who has such authority; and, (c) if a bankruptcy court

determines that a petition was filed by someone without the requisite authority it must dismiss the

case.  Second, under Pennsylvania law it is generally the board of directors that has the authority

to file bankruptcy for a corporation.  *See, In re Industrial Concerns, Inc.*, 289 B.R. 609 (Bankr. W.D.

Pa. 2003).  Third, the Receiver Order conferred exclusively on Shaner the function and authority of

the Debtor's board of directors.  Fourth, the bankruptcy filing for the Debtor made by Habjan as

"shareholder" of the Debtor was therefore unauthorized.

The Court finds this argument persuasive so as to make out a prima facie case for

dismissal.  Indeed, the Debtor does not seem to seriously contest any of the rungs of the Bank's

argument, except for the final conclusory one that the filing was unauthorized.  The Debtor instead

14

raises a number of issues which, as noted previously, the Court chooses to treat as in the nature of affirmative defenses and for which the Debtor bears the burden of proof.  It is to consideration of these issues that the Court now turns.

### The Debtor's Defenses

The Debtor has raised three arguments in opposition to the *Motion,* each of which will be discussed below.[9]

(a)    ***Whether the Receiver Order is void because the state court lacked jurisdiction and violated the due process rights of Habjan and Griebel as Shareholders and Directors of the Debtor***

The Debtor first attacks the Receiver Order on the basis that it is void on jurisdictional and due process grounds.  The basic contentions raised by the Debtor in this regard are that the state court lacked jurisdiction to issue the Receiver Order in the form it did because the Receiver Order included injunctive proscriptions against Habjan and Griebel, who were not named as defendants in the foreclosure action in which the Receiver Motion was filed, even though they were indispensable parties in light of the relief granted.

---

[9]    Actually, the Debtor raises as point "iv" in its Post-Trial Brief another argument related to the contention that Habjan was the 100% shareholder in the Debtor when the Bank extended the loan, and that he and Griebel owned 100% of the shares in the Debtor when the bankruptcy petition was filed.  *Id*. at 18-22.  Since the Court has previously found in favor of the Debtor on that issue, *see supra at 3*, it need not be addressed further.

This argument immediately raises a red flag in that it appears to be a collateral attack in a federal court on a state court judgment. Such an attack implicates the *Rooker-Feldman* doctrine, which denies federal courts the authority to review state court judgments in "cases brought by state-court losers complaining of injuries caused by state court judgments rendered before the [federal] court proceedings commenced and inviting [federal] court review and rejection of those judgments." *Lance v. Dennis*, 546 U.S. 459, 464 (2006). *See also, Hersh v. CitiMortgage, Inc*., 16 F.Supp. 3d 566, 570 (W.D. Pa. 2014) (*Rooker -Feldman* is a "judicially created doctrine that prohibits a federal district court from exercising subject matter jurisdiction over a case that is functionally equivalent to an appeal from a state court judgment."). The Court notes that there has been some recognition of a "void ab initio" exception to the *Rooker-Feldman* doctrine where the underlying state court judgment in question is void. *See, In re Kilmer*, 501 B.R. 208, 215 (Bankr. S.D.N.Y. 2013) (citing cases).

It is not entirely clear whether such a *void ab initio* exception is recognized in the Third Circuit, and if so to what extent. In *In re James*, 940 F.2d 46 (3d Cir. 1991) the court seemed to acknowledge such exception uncritically, but subsequently that case has been distinguished and its language concerning such an exception has been characterized as mere dicta. *See, In re Knapper*, 407 F.3d 573, 581 at note 16 (3d Cir. 2014); *Todd v. United States Bank National Association*, __ Fed. Appx. ___, 2017 WL 1363876 (3d Cir. April 12, 2017) (stating that void judgment exception to *Rooker-Feldman* doctrine has not been adopted by Third Circuit, lacks support, and would appear to require exactly the sort of "review and rejection" of state court judgments that the doctrine was designed to avoid).

16

Based on the most recent Third Circuit decisions, it would thus appear that a *void ab initio* exception should not be recognized and that this Court lacks the power to review and reject the Receiver Order.  However, rather than just rest its opinion on that ground, it makes sense to consider whether the Receiver Order is even void as the Debtor contends because if it is not, the *Rooker-Feldman* exception question becomes moot.

After careful consideration, the Court finds that the Receiver Order is not void as asserted by the Debtor.  As was indicated above, the basic thrust of the Debtor's argument is that Habjan and Greibel were not named as parties in the foreclosure action in which the Receiver Order was entered, yet they were affected by it in their capacity as shareholders, officers and directors of the Debtor because of the grant of authority given to Shaner over the management of the Debtor and the broad  injunctive language of the Receiver Order directed against them.  According to the Debtor, the state court "lacks subject matter jurisdiction to issue an injunction commanding individuals who are not parties to the foreclosure to take any action."  *Debtor Post-Trial Brief* at 5.  The Debtor goes on to argue that once the Bank sought the appointment of a receiver by an order which included injunctive relief against  shareholders and directors, it changed the nature of the proceeding from one that was strictly *in rem* to an injunctive action, thereby making those individuals indispensable parties.  The Debtor contends that the failure to have joined the individuals meant the state court had no jurisdiction over them rendering the Receiver Order void.  *Id.* at 6-7, 12.  Finally, the Debtor raises questions about the procedural due process that was afforded to Habjan and Griebel because they were not named as parties.  *Id*. at 10-11.

The Debtor has not cited to any authority specific to the mortgage foreclosure context in support of its argument.  Instead, it relies upon broad general principles for determining who is an indispensable party and what due process rights require.   In the Court's view this is a mistaken approach.   The state court action in which the Receiver Order was entered was a mortgage foreclosure action, a species of legal proceeding with its own history, characteristics, and, at least in Pennsylvania, procedural rules.  The Court finds that the enforceability of the Receiver Order should be examined from that standpoint first, and only if a satisfactory answer cannot be found there  will there even be a need to resort to the sort of broad principles on which the Debtor is relying.

When that is done, two things become immediately apparent.  First, Pennsylvania has a rule of civil procedure that very specifically provides who is to be named as a defendant in a foreclosure action, and it does not include the shareholders, officers or directors of a corporate mortgagor.  *See, Pa.R.Civ.P. 1044(a)*.[10]   *See also, Newtown Village Partnership v. Kimmel*, 621 A.2d 1036, 1037 (Pa. Super. 1993) (neither a mortgagee-plaintiff nor a mortgagor-defendant can join a party who has no interest in the controverted property).  Thus, even if the Bank had wanted to join Habjan and Greibel as parties in the foreclosure action it could not have done so.

---

[10]     *Pa.R.Civ.P. 1044(a)* provides:

(a) The plaintiff shall name as defendants
    (1) the mortgagor;
    (2) the personal representative, heir or devisee of a deceased mortgagor, if known; and
    (3) the real owner of the property, or if the real owner is unknown, the grantee in the last recorded deed.

Second, the creation of a receivership as a form of relief in a mortgage foreclosure action when the mortgage loan documents allow for such is a well-recognized feature of Pennsylvania foreclosure law and procedure.  *See, e.g., Metropolitan Life Ins. Co. v. Liberty Center Venture*, 650 A.2d 887 (Pa. Super 1994); *Interstate Net Bank v. Donna Jane Apartments Associates*, L.P., 2014 WL 10920475 (Pa. Super, May 9, 2014). The Debtor has not pointed to any authority which would support the proposition that the request for a receiver to be appointed in a foreclosure action somehow changes the nature of the proceeding, nor has the Court itself found any.

These two points make clear that the Bank proceeded properly and regularly in the state court in seeking the Receiver Order.  The fact that the Receiver Order includes injunctive language effectively directed against Habjan and Greibel even though they were not named as parties in the foreclosure action does not change that conclusion.  Under Pennsylvania law an injunction entered against a corporation can be enforced against the individuals who actually control the corporation even though they were not parties to the action in which the injunction was issued. *See, e.g., Neshaminy Water Res. Auth. v. Del-Aware Unlimited, Inc.*, 481 A.2d 879, 884 ( Pa. Super. 1984) ("...where an injunction has issued against a corporation, it may be enforced against officers, agents, representatives, and employees of the corporation who knowingly violate its provisions"), *Belle v. Chieppa*, 659 A.2d 1035, 1039-40 (Pa. Super. 1995) (" appellants' willful violation of the order in their capacity as directors, officers and shareholders of the corporation was clearly contumacious and subject to a civil contempt citation, regardless of whether appellants were joined as parties.  Where corporate officers knowingly disobey an injunction, the injunction can be enforced directly against those officers even when they have not been joined as parties to the suit."), *W. Pittston Borough v. LIW Investments, Inc.*, 119 A.3d 415, 421-22 (Pa. Commw. Ct. 2015).  As

19

the *Belle* court noted, this makes sense because " a corporation acts only through its officers, agents, representatives and employees, and if such persons are permitted to knowingly violate the terms of an injunction, it would be impossible for a court to ever enforce an injunctive order against a corporation." 659 A.2d at 1040. Thus, the Court finds that Habjan and Griebel did not become indispensable parties once the Receiver Motion was filed.

The Debtor's claim of a more generalized lack of due process must also be rejected. Although Habjan and Greibel were not named as parties to the foreclosure action, and did not have to be as explained above, the Bank nevertheless did take some steps to give them notice of the receivership proceeding. Service of the Receiver Motion was made by both Federal Express and U.S. Mail on the Debtor on January 30, 2017, at the Debtor's registered address in Clarion, Pa., followed by similar service of the scheduling order on February 2, 2017. That in itself should have been sufficient to confer actual notice on Habjan and Griebel, the two individuals who owned and controlled the Debtor and were both involved in its day-to-day operations and who for that reason would be expected to quickly learn of the notice. The Bank went even further, sending copies of the Receiver Motion and scheduling order by U.S. Mail on February 3, 2017, to Habjan at two post office box addresses for him, one in Clay, WV and the other in Clarion. Habjan did not deny that the post office boxes belonged to him and did not otherwise explain why he would not thereby have received the notice in due course based on those mailings.

Habjan claims to have learned only late on February 15, 2017, that a hearing on a Receiver Motion had been scheduled for February 16th. That seems implausible on its face given the different notices that were provided, as discussed above. Also, Habjan claims to have learned

of the hearing through Griebel, but the testimony was very vague as to when Griebel herself received

notice of the Receiver Motion and the hearing.  The Court can only surmise that Griebel  must have

received notice shortly after service was made on the Debtor  in late January/early February, well

before the hearing date.  If for some reason she chose not to inform Habjan about this significant

matter until February 15th (and assuming Habjan himself did not receive direct notice by way of the

mailings to him sent on February 3rd, which the Court finds unlikely), that is not something which

can be blamed on a lack of due process.

For the above reasons, the Court does not find the state court to have lacked

jurisdiction, and does not find the Receiver Order to be void.  The Debtor also raises an argument

about the scope of the Receiver Order, stating:

> It is important to note that the contractual right to a receiver, which
> was contained in the note and the mortgage, did not confer upon the
> [state] court the right to disenfranchise the officers or directors of
> Monroe Heights.  A mortgage is an "in rem" document that creates
> "in rem" rights over the collateral.  The relief granted should have
> been limited to the appointment of a receiver over the "collateral."
> It should not have been expanded to the disenfranchisement of the
> directors and officers of Monroe Heights or the entry of injunctive
> relief against Mr. Habjan or Ms. Griebel.

*Debtor's Post-Trial Brief* at 9. The Court has some sympathy with that argument.  The Receiver

Order does appear to be very broadly written for a receiver appointed pursuant to a contractual

provision in connection with a mortgage foreclosure.  *See, e.g., Duparquet Huot & Moneuse Co. v.*

*Evans*, 297 U.S. 216, 221 (1936) (receivership in a foreclosure suit is "limited and special"),

Restatement, Mortgages, §4.3 ("Appointment of a Receiver"), comment c (discussing the nature of

a receiver appointed in a mortgage foreclosure action and how it should be limited to the property

21

covered by the mortgage).  It is, therefore,  at least arguable that the scope of the Receiver Order is

greater than would be necessary or proper.[11]   However, even assuming the Receiver Order is overly

broad in that it gave total control of the Debtor to Shaner, rather than just control of the hotel

properties themselves, that does not make it void.  The scope of the Receiver Order is a subject for

appellate review in the state court, not a basis for this Court to disregard it.

> ### (b)     Whether  the  Debtor's Bylaws gave Habjan the authority to authorize the filing of the petition on behalf of the Debtor as a shareholder

It is clear that, normally, under Pennsylvania law it is the board of directors of a

corporation, and not its shareholders, that have the authority to put the corporation into bankruptcy.

*See, Cuker v. Mikalauskas*, 547 Pa. 600, 611 (1997) (decisions regarding litigation by a corporation

are business decisions within province of the board of directors); *In re Industrial Concerns, Inc*.,

*supra* (under Pennsylvania law,  management of  a business corporation is subject to the direction

of its board of directors); *15 Pa. C.S. 1721(a).*  If this normal rule applies, then Habjan did not have

the authority as a shareholder of the Debtor to approve  the bankruptcy filing, nor could he claim

to have been acting as a director of the Debtor because prior to the filing  he had been displaced in

that capacity by Shaner pursuant to the Receiver Order.

Although  control  of  a  corporation  by  the  board  of  directors  is  the  normal

circumstance, that need not invariably be the case.  *15 Pa. C.S. § 1721*, as amended in 2001, which

---

[11]     Though that is by no means entirely clear.  In addition to the contractual basis for appointing a receiver, the Receiver Order also noted that there were "general equitable grounds" for doing so, which could serve as a basis for a more extensive receivership than the contractual language alone would have allowed.  *See, Receiver Order* at ¶ 10.

is the provision in the Pennsylvania Business Corporation Law dealing with boards of directors, provides that "[u]nless otherwise provided by statute or in a bylaw adopted by the shareholders" all general powers of a corporation are to be exercised by or under the authority of a board of directors. The 2001 Committee Comments to this provision state that "[t]he board of directors is the traditional form of corporate governance but this section provides it is not the exclusive form." Similarly, *15 Pa. C.S. §2332*, which is part of Chapter 23 dealing with statutory close corporations, such as the Debtor, authorizes for the bylaws of a close corporation to provide for its management to be by its shareholders rather than a board of directors.[12]

The purported  Bylaws for the Debtor dated "10/1/2008," which were admitted into evidence as Exhibit CR9 at the evidentiary hearing,  include the following provision:

---

[12]      *Section 2332*, which was adopted in 1988,  states in relevant part:

§ 2332. Management by shareholders

(a) General rule.--A bylaw of a statutory close corporation adopted by the shareholders may provide that the business and affairs of the corporation shall be managed by or under the direction of the shareholders of the corporation rather than by or under the direction of a board of directors. So long as such a provision continues in effect:

(1) Meetings of shareholders need not be called to elect directors.
(2) Unless the context clearly requires otherwise, the shareholders of the corporation shall be deemed to be directors for purposes of applying provisions of this subpart.
(3) The shareholders of the corporation shall be subject to all liabilities imposed and shall enjoy all rights and immunities conferred by law on directors.

(b) Procedure.--Such a provision may be inserted in the articles or bylaws by amendment if all incorporators or all shareholders, regardless of any limitations stated in the articles or bylaws on the voting rights of any class, authorize the provision...

(c) Notice on shares.--If the articles or bylaws contain a provision authorized by this section, the existence of the provision shall be noted conspicuously on every share certificate issued by the corporation unless the certificate complies with section 2321(c) (relating to notice of statutory close corporation status).

*15 Pa. C.S. § 2332.*

ARTICLE III-DIRECTORS

Section 1. Powers. Subject to the provisions of the Pennsylvania
Code and any limitations in the articles of incorporation and these
bylaws, the business and affairs of the corporation will be managed
and all corporate powers will be exercised by or under the direction
of the board of directors, stockholders and/or shareholder.

The Debtor relies on this provision as a grant of authority to both the board of directors and the

shareholders to exercise corporate power.  The Debtor thus seems to be arguing that even if Habjan

*qua* director lacked the authority to put the Debtor into bankruptcy because the Receiver Order had

removed that authority from him and given it to Shaner, Habjan *qua* shareholder still had authority

to do so because the Receiver Order did not take away any power from the shareholders.

The Bank responds to this argument in a number of ways.  It points out that *15 Pa.

C.S. §2332* requires that if a statutory close corporation's bylaws have a provision vesting corporate

management in the shareholders the existence of such provision is to be conspicuously noted on

every share certificate issued by the corporation, something the Debtor's certificates lack.  It

characterizes the Bylaws as suspicious because they were produced very late in discovery under

questionable circumstances.  The Bank also argues that, even if the Bylaws are found to be valid,

they should not be construed as the Debtor proposes, pointing out that the Debtor has provided no

evidence that any corporate action of the Debtor prior to the bankruptcy filing here was ever

authorized by the Debtor's shareholders instead of the board of directors.  Finally, the Bank argues

that the use of the word "rather" in *Section 2332* indicates that either the board of directors or the

shareholders are permitted to manage a statutory close corporation, but not both, and that in this

instance all evidence points to the board of directors as the seat of management authority for the

Debtor.

24

The Court begins with the question of the validity of the proffered Bylaws. The Bank rightfully calls attention to the unusual circumstances attending the discovery and disclosure of the Bylaws. The "last minute" nature of their discovery and the location in which they were found naturally raise questions as to whether the Bylaws are what they purport to be, a 2008 creation that long pre-date the bankruptcy filing, or are instead a more recent and deceptive creation, intended to bolster the theory that Habjan as shareholder was authorized to approve the Debtor's bankruptcy filing.

The Court finds that the Bylaws were created in 2008 as the Debtor asserts. The testimony given by Habjan concerning his discovery of the Bylaws was credible and he provided a plausible explanation as to both the timing and location of the discovery. Also, the timing of the adoption of the Bylaws in 2008 makes sense in light of the dissolution of Habjan's marriage and his former wife's relinquishment of her stock in the Debtor which were happening at about that same time. Given the fundamental change in the ownership structure of the Debtor, it appears to have been a natural time to create new bylaws. Finally, perhaps viewing things a bit cynically, the Court would expect that bylaws purporting to be created in 2008, but actually only created recently with an intent to deceive, would have much clearer and stronger language regarding shareholder control of the Debtor than is the case with Exhibit CR9.

Having found the Bylaws to be valid, the Court next turns to the question of whether *15 Pa. C.S. §2332* permits a statutory close corporation to have its management authority vested simultaneously in a board of directors and its shareholders, as the Debtor contends, or whether such authority can be vested in one or the other, but not both, as the Bank argues. The parties have not

25

cited to any authority construing *Section 2332* on this point, nor has the Court found any.  On this issue of first impression, the Court finds that the Bank has set forth a more reasonable construction of the statute.  There are two primary reasons for this conclusion.

The first reason relates to the clear language of the statute.  *Section 2332(a)* provides the general rule that a close corporation's bylaws may provide that the corporation "shall be managed by or under the direction of the shareholders of the corporation *rather than* by or under the direction of a board of directors." (emphasis added).  The Court believes that, in the context presented, the emphasized "rather than" language should be read as synonymous with "instead of," and indicates that a binary choice is being provided.  This is a common understanding of the meaning of the phrase "rather than."  *See, e.g.*, https://www.powerthesaurus.org/rather_than (last visited July 31, 2017).  The alternative  proposed by the Debtor would require "rather than" to be read as synonymous with "and/or."  That is an unusual construction to say the least, and the Court finds it unconvincing.  Additionally, *Section 2332(a)* clearly contemplates the elimination of the board of directors if the shareholders option is chosen – for example by providing that shareholder meetings to elect directors need not be called and providing shareholders with all the liabilities, rights and immunities of directors.  The Debtor has not explained how its dual-management construction  comports with those provisions of the statute.

The second reason relates to the principle that in enacting a statute the Pennsylvania General Assembly does not intend a result that is absurd or unreasonable.  *See, 1 Pa. C.S.  §1922(1).* This principle may be employed as an aid in construing ambiguous statutes.  The Court finds that it would be absurd or unreasonable to allow a close corporation to be simultaneously managed by

26

its board of directors and its shareholders.  To allow such a state of affairs would invite chaos.  Who would have ultimate control in the event of conflicting resolutions from the two "managers?"  Would parties dealing with such a corporation find it necessary to protect themselves by asking for proof that both the board of directors and the shareholders had approved a particular corporate action?  Of what benefit would *Section 2332* be?  Thus, to the extent that *Section 2322* can be viewed as ambiguous with respect to the issue of management authority, the principle of avoiding an absurd or unreasonable result weighs against the Debtor's position.

The Court thus finds that *Section 2332* does not allow a statutory close corporation to vest management authority in both its board of directors and its shareholders.  The "default" provision for close corporations is control by the board of directors.  If the shareholders choose to control a close corporation directly, under *Section 2332* they may do so by enacting appropriate bylaws that vest such power in them instead of in a board of directors.  Thus, it only remains to review the Debtor's Bylaws to determine whether they effect the shareholder control option authorized under *Section 2332*, or whether they do not, leaving control with the board of directors.

The only indication in the bylaws that the shareholder control option has been chosen is the fleeting and rather vague statement in Article III: Section 1, quoted above,  that the corporation will be managed by and all power will be exercised by the "board of directors, stockholders and/or shareholder."  Even if this language is only suggestive at best of an attempt to create a power sharing arrangement, something the Court has found not authorized by *Section 2332*.  On the other hand, the Bylaws are replete with provisions indicating that the Debtor has a board of directors and that it is the board that exercises ultimate corporate power.

27

Examples of control being vested in the board of directors include, for example, that the board of directors will fix the location of the principal and branch offices of the Debtor (Article I), and schedule annual and special shareholder meetings (Article II). There is an entire Article III dealing with directors, and providing for such things as the number of directors (Section 2), the election of directors (Section 3), directors meetings (Sections 5-7), and director action without meetings (Section 10). None of this would have been necessary if the intent was to do away with board of director control and vest all power in the shareholders. The board of directors is also to annually appoint officers of the corporation (Article IV, Section 2), and to have control over them (Article IV, Section 5). It is the board of directors that by resolution may authorize officers, agents or shareholders to enter into contracts or sign instruments on behalf of the corporation (Article VI, Section 2).

The Court concludes that the language of the Bylaws, plainly read, gives a clear indication that the intent was to maintain the default position under Pennsylvania law pursuant to which the board of directors exercises primary control over the corporation, including the decision whether to file bankruptcy. This conclusion is further bolstered by two other circumstances which, while not dispositive in themselves, are consistent with that finding. One is that the share certificates of the Debtor do not contain the conspicuous notice of shareholder control required by *Section 2332(c)*. The Court does not hold that the absence of such notice must automatically exclude a finding that shareholder control has been effected, but it is at least a relevant factor for consideration. The other circumstance is that, except for the purported shareholder resolution by which the Debtor was placed in to this bankruptcy, the Debtor has been unable to show any other

28

instance where corporate action was instigated by shareholder resolution.[13]  The inability to show

any history of shareholder resolution as a feature of the management of the Debtor indicates  that

shareholder control was not intended by the Bylaws.


> (c)  *Whether the Receiver Order should be disregarded as in violation of the Supremacy Clause of the United States Constitution*

The Debtor next makes the argument that the Receiver Order should be found void

because, as sought and obtained, it was in violation of the Supremacy Clause of the Constitution,

which provides that all laws made pursuant to the Constitution shall be the supreme law of the land

and shall enjoy legal superiority over any conflicting provision of state law.  *See, Constitution,*

*Article VI, Section 2.*  According to the Debtor, the Receiver Order did not merely change the

identity of the party authorized to file bankruptcy on behalf of the Debtor from the board of directors

to Shaner, as the Bank would have it, but effectively blocked the Debtor from access to the

bankruptcy court by appointing a receiver and enjoining the parties who had previously enjoyed the

power to authorize a bankruptcy filing.

For this argument the Debtor relies principally on *In re Corp. & Leisure Events*

*Prods., Inc*., 351 B.R. 724 (Bankr. D. Az. 2006).  In that case, much like the one here, the court was

faced with the issue of who was authorized to initiate bankruptcy filings on behalf of a group of

---

[13]    In that regard, the Court rejects the Debtor's argument that the documents introduced at trial as Exhibits MH1-MH5 can be viewed as shareholder resolutions.  They instead appear to be minutes of meetings between Habjan and Griebel.  It is impossible to tell from the face of the documents themselves whether they were meeting as directors, or as shareholders, or otherwise. Regardless, the Court does not believe they can reasonably be viewed as resolutions.

corporate debtors, the two individuals who had formerly owned and controlled them as directors, or the state court-appointed receiver who had been given authority over the corporations and the power to remove and appoint directors.  Shortly after the sate court receivership order was entered, the two individuals began filing bankruptcy petitions for the various entities and the receiver responded by filing motions to dismiss on the grounds that the individuals lacked the authority to do so.

The *Leisure* court began by noting that it was not dealing with the "ordinary" type of intracorporate authority dispute wherein one faction of corporate officials dispute whether another faction has the authority to make a filing on behalf of the corporation.  Instead, because the appointment of the state court receiver had been done at the behest of creditors of the debtors, the court said it was faced with what it called a "creditor-driven intracorporate dispute."  The court found that to be significant because, unlike the ordinary kind of intracorporate dispute wherein the question of authority is governed by the law of the state of incorporation, a creditor-driven intracorporate dispute is determined differently.  351 B.R. at 728.

Referencing the history of bankruptcy law, which it said largely "deals with efforts by creditors to escape bankruptcy court jurisdiction or to enforce remedies provided by state law that are unavailable under bankruptcy law," and the "race to the courthouse" that it said had frequently occurred prior  to the creation in the *Bankruptcy Act of 1867* – and enactment of the first statutory provision allowing federal courts sitting in bankruptcy to stay state court proceedings – the *Leisure* court held that an exception to the general rule of deferral to state law to determine who is authorized to file a voluntary petition for a corporation is necessary in cases involving a creditor-

30

driven intracorporate dispute in order to vindicate federal bankruptcy law supremacy. After noting

that the general rule of deferral itself did not derive from the language of the *Bankruptcy Code*, or

any of its predecessor bankruptcy statutes, but rather from federal common law, the Leisure court

stated:

> ... there is a federal common law exception to this reliance on state
> law when the state law is in the form of a receivership order that
> attempts to preclude any of the original constituents of the
> organizational entity from filing a petition on its behalf, in order to
> maintain the state court remedy that has been obtained by creditors.
> It makes no difference whether the corporate officers and directors
> were actually removed by the receiver or the receivership order
> merely enjoins their interference or filing of a petition. In either case,
> state law withdraws their authority to file for bankruptcy relief and
> yet in both cases the unanimous federal common law holds that they
> are nevertheless entitled to do so. Much of this common law predates
> the drafting and adoption of the Bankruptcy Code, so Congress must
> be assumed to have incorporated it when it drafted the Code.

*Leisure*, 351 B.R. at 731. The *Leisure* court further found that Congress had expressly incorporated

this federal common law exception by a provision in the Chandler Act of 1938 making it explicit

that a bankruptcy case would ordinarily supersede a state receivership, and that a state receiver

would ordinarily be required to turn over the estate assets to the debtor in possession or trustee. 351

B.R. at 732, citing *Bankruptcy Act §2a(21)*, the forerunner to current *11 U.S.C. §543*.

Much like the Bank here, the creditors in *Leisure* argued that the receivership order

had not blocked the debtors from bankruptcy, it had merely changed the identity of the party with

authority to make such filing. The court rejected that argument, stating:

> Nor is it any answer to say that analysis should not apply here
> because this Receiver did have authority to file for the receivership
> entities.   Congress obviously intended bankruptcy relief to be
> available for the benefit of many of the constituents of a business
> entity, including not only the creditor interests but also the equity
> interests and perhaps those of employees and customers as well.
> While bankruptcy case law generally refers to state law to determine
> who has eligibility to file the petition, it unanimously refuses to do so
> (in the absence of an intracorporate dispute) when state law has
> provided a creditor's remedy to vest that authority in a receiver.

*Leisure*, 351 B.R. 724 at 732 (footnotes omitted).

*Leisure* thus stands as a  support for the Debtor's position in the present case in that the intracorporate dispute that occasioned the *Motion* is clearly of the "creditor-driven" variety, to use the terminology of the *Leisure* opinion.  In response, the Bank relies chiefly on *Sino Clean Energy, Inc. by and through Baowen Ren v. Seiden*, 565 B.R. 677 (D. Nev. 2017), which criticized *Leisure* as an "outlier" and found that directors who had been removed from their positions by a state court-appointed receiver seven (7) months previously lacked authority to file a bankruptcy petition for the debtor.  The pertinent facts of *Sino* are of some importance in understanding this holding.

Sino was a holding company for various Chinese entities that produced coal-water slurry as an alternative fuel source.  The company became involved in a number of law suits in the United States.  Its shareholders, concerned that the company's board of directors was not managing the company properly, filed suit in a Nevada state court asking that a receiver be appointed to take over the company's affairs because they feared it would otherwise become insolvent.  The directors were served with the complaint but they never responded to it.  The state court entered an order

finding that the directors had grossly mismanaged the company, and appointied a receiver that was empowered to pick a new board of directors for the company and take control of its property.  The receiver first attempted to work with the existing directors, but when that proved unsuccessful the receiver dismissed them and appointed new directors.  Seven months later – and more than a year after the receiver had been appointed – the former directors filed a bankruptcy petition on behalf of the company.  The newly- appointed board passed a resolution withdrawing the bankruptcy petition, and the receiver moved to dismiss the case on the ground of lack of authority.  The bankruptcy court granted the motion to dismiss, holding that the individuals who had filed the petition had been removed as directors and thus had no authority to file for the company.

On an appeal to the district court, the ousted directors did not dispute that under Nevada law it would be the current board of directors that had the authority to file a bankruptcy, but they cited to *Leisure* and argued that federal bankruptcy law  prevented a state-appointed receiver from blocking a corporation's directors from filing for bankruptcy by replacing them with new directors.   As indicated above, the *Sino* court rejected the holding in *Leisure*, stating:

> At bottom, both the court in *Corporate and Leisure* and the appellants appear to be blurring the line between the rule preventing states from barring corporations from bankruptcy court, and the longstanding rule empowering states to determine who gets to file for bankruptcy in the first place.  Appellants provide no rationale for treating a state-appointed receiver any differently from other state laws defining who can file for bankruptcy on behalf of a corporation.

*Sino*,  565 B.R. at 682.  The *Sino* court went on to say that it found the weight of authority ultimately came down to two principles:  first, that states have the power to decide who is best suited to make business decisions for a corporation; and second, that states cannot significantly interfere with a

corporation's access to the bankruptcy system. *Id.* at 683. It found that the result reached by the bankruptcy court aligned with both principles because the state had designated the receiver, who had in turn designated the new board, and there was no evidence that either the receiver or the new board could not file for bankruptcy on behalf of Sino. *Id*.

Are *Leisure* and *Sino* in irreconcilable conflict, and in the absence of any controlling authority from the Third Circuit must this Court choose one or the other approach? Not necessarily, because the Court believes the two cases are not as far apart as they may appear at first blush.

To begin with, there are obvious key factual differences between the two cases. *Leisure* involved a receiver that was appointed at the request of a creditor of the corporation and bankruptcy filings made soon thereafter, while *Sino* involved a receiver that was appointed at the request of the shareholders of the corporation and a bankruptcy filing that did not occur until many months later. The present case is thus factually much closer to *Leisure* than it is to *Sino*. *Sino* is perhaps also subject to criticism for unfairly characterizing the actual holding in *Leisure*. As was discussed above, the *Leisure* court limited its holding to receivers appointed as the result of creditor-driven intracorporate disputes (again, such as we have in the present case) and stated that the holding represented an exception to the normal rule that state law determines who has authority to file bankruptcy for a corporation. That important caveat is not recognized by the *Sino* court.

Beyond that, the courts in both cases drew back from establishing hard and fast rules on the question of a bankruptcy filing by a corporation for which a state receiver has been appointed. For its part, after concluding that the case appeared to fall within an exception to the general rule because the receiver had been appointed at the request of a creditor, the *Leisure* court went on to say

34

that it did not believe a bright-line rule was the appropriate way to view the matter in any event.

Pointing to the discretionary powers that a bankruptcy court has to compel or not compel a receiver

to turn over property to the estate, *see 11 U.S.C. §543(d)(1)*, and to abstain or suspend proceedings

if the interests of creditors and the debtor would be better served, *see 11 U.S.C. §305(a)(1)*, the court

stated:

> The express powers to excuse turnover or abstain provide ample
> authority to balance the equities based on the facts of each individual
> case, and provide a more sensible and fact-based resolution than any
> bright-line test of corporate authority or race to the courthouse could
> provide. That is obviously the remedy Congress preferred and
> dictated, rather than the simple race to the courthouse on which the
> Receiver and creditors rely

351 B.R. at 733. The *Leisure* court therefore denied the receiver's initial motion to dismiss which

had been based solely on the basis of lack of authority, but without prejudice to the receiver pursuing

three other motions it had filed to challenge the continuation of the bankruptcy case: a second,

parallel motion to dismiss based on bad faith, a motion to excuse turnover, and a motion to abstain

or suspend.

In a similar way, despite its holding that the former directors of the debtor lacked

authority to file the bankruptcy petition because a receiver had been appointed and they had been

removed, the *Sino* court nevertheless went on to say:

> Perhaps this case would be different if appellants [i.e., the former
> directors] could show that a receiver was biased or significantly
> delayed in appointing a new board, thus interfering with the
> corporations' ability to get into bankruptcy court in a timely matter.
> But that is not the case. The receiver appointed a new board almost
> a year before the appellants filed this rogue bankruptcy petition.

*Sino*, 565 B.R. at 682, fn. 26.  The Court views this as a recognition that there may well be instances when it would be appropriate to allow those formerly in control of a corporation to file a bankruptcy even though a receiver has been appointed, for instance if the receiver is biased in favor of  the interest of the creditor that got it appointed, or if the receiver is being derelict in its duties.

It thus seems that *Leisure* and *Sino* can be largely harmonized, with both acknowledging that the decision they had reached could have been different depending on the particular facts presented.  Perhaps at the risk of oversimplifying somewhat, the Court believes the difference in the two cases arises from the starting point chosen.

In *Leisure* the court started with the view that those formerly in control of a corporation should still be able to file a bankruptcy for it because a receiver appointed at the request of a creditor would unfairly favor the creditor and not act in the interest of all constituencies of the corporation, leaving it up to the receiver to show why under the particular facts of the case that view was wrong and the case should not proceed.  In *Sino*, the court started with the view that a receiver would act fairly and in the interest of all constituencies, leaving it up to those formerly in control of the corporation to show why that view was  wrong under the facts of the particular case.

Given its prior conclusion as to the burden of proof to be imposed in this case, the Court finds that the approach taken in *Sino* to be a better fit.  The *Sino* approach also seems to comport more closely  with the respect that is rightfully due the outcome in  a state court receivership proceeding proper on its face.  However, if it ever becomes apparent that the state court proceeding resulted in an improper impediment to a corporate debtor's  access to the bankruptcy

36

system due to the appointment of a receiver that is not carrying out its duties in a disinterested

manner, then the need to assure federal supremacy in the area of bankruptcy must overcome the

initial deferral to the action of the state court, allowing those formerly in control of the debtor to file

bankruptcy on its behalf.


### *CONCLUSION*


In more concrete terms, this means the Court here begins with the presumption that

the appointment of Shaner as Receiver vested the authority to file bankruptcy for the Debtor

exclusively in Shaner's hands.  In order to overcome that presumption, the Debtor would  have to

show that Shaner is biased against the interests of Habjan and Griebel,  or is otherwise being derelict

in its duties, to the point that it would interfere with the Debtor's ability to access the bankruptcy

system.  That showing has not been made; there was no evidence presented at the evidentiary

hearing that would tend to show any bias in favor of the Bank or lack of diligence on the part of

Shaner.  To be fair, however, prior to the issuance of this *Memorandum Opinion*, the Debtor may

not have anticipated the need to provide such evidence.  Therefore, while the Court will grant the

*Motion* and dismiss the case, it will delay the effectiveness of such order for 14 days.  If in the

meantime the Debtor files a motion for reconsideration that raises as an issue the fitness of Shaner

to serve as Receiver based on the principles discussed above, the Court may further delay

implementation of the dismissal and schedule another  evidentiary hearing strictly limited to that

matter.

An appropriate Order follows.

Dated: August 22, 2017

Thomas P. Agresti, Judge
United States Bankruptcy Court

Case Administrator to serve:
     David Ross, Esq.
     Donald Calaiaro, Esq.
     George Snyder, Esq.
     Larry Wahlquist, Esq.
     Debtor